Julie C. Erickson, State Bar No. 293111 (julie@eko.law)
Elizabeth A. Kramer, State Bar No. 293129 (elizabeth@eko.law)
Kevin M. Osborne, State Bar No. 261367 (kevin@eko.law)
**Erickson Kramer Osborne LLP**
44 Tehama Street
San Francisco, CA 94105
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.A., a minor, represented by his mother and next friend ANDREA DEAMS, individually and on behalf of others similarly situated,<br><br>　　Plaintiff,<br><br>vs.<br><br>2K GAMES, INC.; and TAKE-TWO INTERACTIVE SOFTWARE, INC.,<br><br>　　Defendants. | Case No.: 3:23-cv-5961<br><br>CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL<br><br>Complaint for:<br><br>1. Conversion<br>2. Civil Theft (Cal. Penal Code §§ 484 & 496)<br>3. Unfair Business Practices (Cal. Bus & Prof. Code §§ 17200, *et seq*.) |

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
1

Plaintiff J.A. ("Plaintiff"), a minor represented by his mother and next friend ANDREA DEAMS, on behalf of himself and others similarly situated ("the Class"), brings this action against Defendants 2K GAMES, INC. ("2K Games") and TAKE-TWO INTERACTIVE SOFTWARE, INC. ("Take-Two") (collectively, "Defendants") for actual damages suffered by Plaintiff and the Class, for equitable relief, and for other recovery specified herein, and alleges upon information and belief, except as to his own actions, the investigation of his counsel, and the facts that are a matter of public record, as follows:

## INTRODUCTION

1. The worldwide videogame, or "gaming," industry is worth over $200 billion—more than both the newspaper and broadcast television industries. In the U.S., the industry has more than doubled in value in the last 10 years and now earns an estimated $106 billion in annual revenue.

2. This staggering value is the result of a shift in gaming companies' revenue models. Rather than earning money just from selling games, modern gaming companies generate revenue from in-game transactions designed to enhance the experience for gamers playing games they already own.

3. In-game transactions have moved the gaming marketplace away from the retail stores that sell games and into the games themselves. Problematically, many games are played primarily by children, who often do not realize the nature of the transactions they make within games.

4. 2K Games is a videogame publisher with a dominant presence in the sports segment of the gaming market. Its NBA 2K franchise is, by some measures, the most popular videogame in the U.S.

5. NBA 2K and similar franchises published by 2K Games are prime examples of games that use in-game transactions to generate revenue. The game allows gamers to spend real money to buy in-game currency that can then be used to boost player performance, purchase uniform upgrades, add unique hairstyles, and other features otherwise unavailable to gamers.

6. 2K Games periodically publishes new versions of its sports games. 2K Games also retires its older sports games every year. Those who own an older version of the game can continue

playing, but their access to online play and ability to engage in the game's online features are gone.

7. When terminating an older game, 2K Games also terminates gamers' access to the funds that remain in their in-game wallets. The funds are lost when the game is terminated—they cannot be transferred to another game or redeemed. Gamers are given no warning when they purchase the in-game currency that it can be destroyed at 2K Games' whim. Their only option is to swallow their losses and, if they wish to continue to use 2K Games' pay-to-play features, re-up new funds in an active version of the game.

8. For years, 2K Games has refused to refund gamers, including children, for their unused in-game currency. 2K Games offers no reason or explanation for why it does not refund or allow transfer of these funds from its customers' accounts.

9. This class action seeks redress for gamers who lost in-game currency from their NBA 2K accounts because of 2K Games' deceptive and unfair conduct.

## FACTUAL ALLEGATIONS

10. An estimated 3.2 billion people worldwide play videogames—more than 4 out of every 10 people on Earth. In the U.S., that ratio is even higher. Nielsen estimates 66 percent of Americans are "gamers."

11. Both the number of gamers who regularly play videogames and the hours they play per day have increased dramatically over the last decade. The percentage of Americans who play video games has increased from an estimated 47 percent in 2010 to the aforementioned 66 percent today. Gamers spent an average of 5.1 hours per week playing videogames in 2011; that number increased to 14.8 hours in 2020.

12. Game publishers have reaped astonishing revenue growth from both an increased user base and by changing their business model. Whereas games were once purchased in a package for a fixed price from brick-and-mortar shops, publishers now sell games entirely online and generate revenue from downloadable content, or "DLC," sold to players after a game is purchased. The DLC model has allowed gaming publishers to generate most of their revenue from online activities, including subscriptions, advertisements, and "microtransactions," where

gamers make in-game purchases to enhance the gaming experience. While in 2013, DLC accounted for less than a quarter of the revenue generated by gaming companies, it currently represents more than 70 percent.

13. When successful, the microtransaction model generates staggering revenue. In 2017, Activision Blizzard, the maker of the popular *Call of Duty* line of games, claimed $4 billion in revenue from microtransactions alone.

14. Children (persons under the age of 18) are a primary target audience for game publishers. According to a Kaiser Family Foundation survey, American children spend more time using screen-based media than doing any other activity besides sleeping. And the Pew Research Center reports that 90 percent of American adolescents (children between 13 and 17 years old) now play videogames on a regular basis.

15. 2K Games profits off gamers, including child gamers, by offering upgrades to their gaming experience in exchange for DLC transactions. Various games that are popular with young gamers, including NBA 2K (basketball), WWE 2K (professional wrestling), and PGA Tour 2K (golf), operate by offering gamers various in-game upgrades that are particularly appealing to young gamers and are purchased in the game using virtual currency, or "VC."[1] Gamers purchase VC with real money, then use the VC to purchase tchotchkes or improve their gameplay. Spending VC allows gamers to improve the quality of their players' skill and, accordingly, their ability to compete against others online. For younger players, being competitive requires purchasing VC due to the very nature of these games' pay-to-win methodology.

16. Moreover, younger players in the 2K Games environment are constantly presented youth-targeted offers, deals, and advertisements from companies selling cookies, breakfast cereal, sneakers, soda, and sports drinks, encouraging them to spend real money to acquire VC.

---

[1] In addition to VC, NBA 2K also allows users to purchase and spend a second type of in-game currency called MyTEAM points, or "MT." MT operates in essentially the same manner as VC. The term "VC" is used throughout this complaint to refer to any form of in-game currency.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
4

17. The offers start before the gamer has even completed their purchase of the game. For example, as a customer completes the prompts for online purchase of NBA 2K, they are offered "Add-Ons" of VC available at an additional cost. Presently, a player can purchase Add-Ons for as little as $5.

18. As gamers progress through a game's modes of gameplay, they are encouraged to spend real money on VC through special promotions, many of which specifically target children. For example, a 2023 NBA 2K tournament sponsored by Chips Ahoy! cookies, using promotional material featuring an NBA 2K player riding a Formula-1-style go-cart, offered gamers a chance to win 1 million VC credits if their players were skilled enough to win in online tournament play against other competitors. Such promotional material observably targeted children and incentivized them to succeed in the game by buying VC.



19. NBA 2K also features "Card Packs," a system where gamers spend VC to buy the equivalent of a pack of basketball cards. These cards give gamers access to anything from skilled players to unique shoes, basketballs, stadiums, and jerseys. Gamers are rewarded for reaching collection milestones, such as collecting 2,500 cards. Both packs of cards and individual cards can be purchased with VC, which is in turn acquired with real money.

20. Cards and card packs are presented to gamers in promotions displayed both inside the game environment and elsewhere and are used to bait gamers into buying more VC. For example, NBA 2K partnered General Mills in 2018 and 2019 for child-focused Reese's Puffs

promotions where gamers received "FREE NBA2K19 MyTEAM League Pack & VIRTUAL CURRENCY" when they bought a box of candy-flavored breakfast cereal. The gamers received only a nominal amount of VC from the promotion—approximately $0.33 worth of VC if one were to purchase it directly through the game. The intended effect, however, was to shepherd consumers of children's breakfast cereal into the NBA 2K VC marketplace, where they were then encouraged to buy more VC.



21. Like other sports videogame franchises, 2K Games continually replaces older versions of games with updates. New versions of the games reflect real-world changes in athlete characteristics and team rosters, improve the style and graphics of the gaming environment, and, of course, offer new ways to spend VC.

22. When 2K Games updated NBA 2K17 to NBA 2K18, it introduced many new features that required users to spend substantial VC if they wished to buy items like haircuts and tattoos. Fans revolted, threatening en masse to boycott the game because of the excessively high new prices. 2K Games relented soon after the game was released, reducing the VC cost of many items by 90 percent. But the following edition of the game, NBA 2K19, reintroduced many of the same items with hiked up prices.

23. Each year, when it introduces new versions of NBA 2K, WWE 2K, and PGA Tour 2K, 2K Games also retires older versions of those game by disabling the servers that allow the games to operate in a live, online environment. According to 2K Games, the cost of continuing the operation and maintenance of servers eventually becomes untenable as fewer and fewer gamers use older versions of the game.

24. 2K Games is different from other sports game franchises, however, in that it retires games fare more rapidly than other publishers. As an example, 2K Games retired NBA 2K21 on December 31, 2022, just over two years after the game's release. Other sports videogame franchises, such as EA Sports' *Madden NFL* franchise, remain enabled for five years or more after newer games have been released as their servers remain connected and maintained. Currently, EA Sports' *FIFA '18* (soccer) videogame, released in September 2017, was still fully operational, as were all six subsequent versions of the game.

25. In tandem with retiring an older version of a game, 2K Games also needlessly removes any VC remaining in all gamer accounts for that game. Gamers' accounts immediately fall to a zero VC balance the instant the server is disconnected. The VC they own cannot be carried over to the next version of the game or transferred to other games. Gamers may have hundreds or thousands of dollars' worth of VC in their accounts. It makes no difference.

26. There is no justification for wiping out gamers' VC. For years, other gaming franchises, such as *Call of Duty*, have carried over the equivalent of VC into newer editions of the game, allowing users of newer versions to use in-game currency collected in older versions. There is no technological limitation or business justification for wiping out players' VC, and 2K Games offers no explanation for doing so.

27. 2K Games' conduct described herein is unfair, illegal, and greedy. After bombarding gamers, including child gamers, with manipulative marketing designed to entice them to invest real money in VC under the pretense of ownership, it needlessly wipes out the VC they acquired to drive them to buy more VC in a new game setting. Plaintiff brings this action to enjoin this misconduct and reclaim the value of the VC 2K Games has wrongfully taken away.

**JURISDICTION AND VENUE**

28.     This action is brought under the common law tort of conversion, California's civil theft law (Cal. Penal Code §§ 484 & 496), and California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*) for monetary and equitable non-monetary relief due to Defendants' conduct.

29.     This Court has personal jurisdiction over Defendants because Defendants and their affiliates do business in the state of California and the claims asserted herein arise from conduct occurring in California.

30.     Venue is proper in this Court because, *inter alia*, Defendants engage and perform business activities in Marin County. Many of the acts committed by Defendants complained of herein occurred in this judicial district.

**THE PARTIES**

31.     Plaintiff J.A. is, and at all relevant times was, a resident of the state of California. As J.A. is a minor under the age of 18, he is represented in this action by his mother and next friend, Andrea Deams. J.A. purchased and had an account for videogames in the 2K Games family of videogames, including NBA 2K. During and after 2020, J.A. used fiat currency to purchase in-game currency, or VC, in the NBA 2K videogame. In December 2022 and before, 2K Games disabled its servers for the version of NBA 2K videogame J.A. owned and eliminated the VC J.A. held in his account. J.A. presently holds VC in a 2K Games account that, based on information and belief, 2K Games intends to remove in December 2023.

32.     Defendant 2K Games is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located in Novato, California. 2K Games is the publisher of NBA 2K, WWE 2K, and PGA Tour 2K. It is a subsidiary of Defendant Take-Two.

33.     Defendant Take-Two is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located in New York, New York. 2K Games is the parent company of Defendant 2K Games.

34. At all relevant times, all Defendants were and are legally responsible for all of the unlawful conduct, policies, practices, acts, and omissions as described in each and all of the foregoing paragraphs, unless otherwise indicated.

35. At all relevant times, the unlawful conduct against Plaintiff and Class members as described in each and all of the foregoing paragraphs was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, upon information and belief, the unlawful conduct described in each and all of the foregoing paragraphs was reasonably foreseeable by Defendants and committed under actual or apparent authority granted by Defendants such that all of the aforementioned unlawful conduct is legally attributable to all Defendants.

## CLASS ALLEGATIONS

36. Plaintiff brings this action to seek equitable non-monetary and monetary relief as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and the following Class:

> All persons whose in-game currency was removed from a 2K Games account from November 17, 2019, to the present.

37. Plaintiff reserves the right to amend the Class definition if discovery or further investigation demonstrate that it should be expanded or otherwise modified.

38. The members of the Class are so numerous that joinder of all members would be impracticable.

39. There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including:

40. Whether the Class had an ownership interest in the VC held in their 2K Games accounts;

41. Whether Defendants exercised dominion over VC when they removed it from the Class members' accounts;

42. Whether Defendants unlawfully appropriated VC belonging to Class members when they removed it from the Class members' accounts;

43. Whether Defendants had the intent to appropriate the Class members' VC when they removed it from the Class members' accounts

44. Whether Class members purchased VC from Defendants under false pretenses;

45. Whether Defendants' conduct constitutes an unfair business practice under California law;

46. Whether and, if so, in what amount, the Class members suffered damages when their VC was removed;

47. Plaintiff's claims are typical of the claims of the Class. Plaintiff has no interests antagonistic to those of the Class and are not subject to any unique defenses.

48. Plaintiff will fairly and adequately protect the interests of the Class and has retained attorneys experienced in class action and complex litigation.

49. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, inter alia, the following reasons:

50. It is economically impractical for members of the Class to prosecute individual actions;

51. The Class is readily ascertainable and definable;

52. Prosecution as a class action will eliminate the possibility of repetitious litigation.

53. A class action will enable claims to be handled in an orderly and expeditious manner, will save time and expense, and will ensure uniformity of decisions.

54. Plaintiff does not anticipate any difficulty in the management of this litigation.

## CAUSES OF ACTION

### First Cause of Action

#### Conversion

55. Plaintiff incorporates the above allegations as if set forth fully herein.

56. Plaintiff and the Class members purchased VC from Defendants and owned, possessed, or held a right to possess the VC they purchased.

57. Defendants knowingly and intentionally removed VC from Plaintiff and the Class members' accounts.

58. At the time Defendants removed VC from Plaintiff and the Class members' accounts, the amount and value of the VC Defendants removed was a specific and identifiable sum known to Defendants.

59. Defendants substantially and completely interfered with Plaintiff and the Class members' ownership of, possession of, and right to their VC by knowingly and intentionally removing it from Plaintiff and the Class members' accounts, thereby taking possession of it, preventing Plaintiff and the Class from having access to it, destroying it, and refusing to return it.

60. Plaintiff and the Class did not consent to Defendants removing their VC from their accounts, taking possession of it, preventing Plaintiff and the Class from having access to it, destroying it, or refusing to return it.

61. Plaintiff and the Class were harmed by Defendants' conversion of their VC. They experienced both economic loss in the amount of the VC Defendants converted, and non-economic harm in the form of emotional distress, anxiety, worry, and shock caused by the taking of their VC.

62. Defendants' misconduct entitles Plaintiff and the Class to recover the full value of the property Defendants converted.

## Second Cause of Action

### Civil Theft

### (Cal. Penal Code §§ 484 & 496)

63. Plaintiff incorporates the above allegations as if set forth fully herein.

64. Defendants' conduct described herein constitutes various manners of theft, including but not limited to theft by embezzlement, in that Defendants rightfully accepted money from Plaintiff and the Class in exchange for VC with an intent to remove any unused VC remaining in the accounts of Plaintiff and the Class at the time that the game for which the VC was purchased was retired, constituting an unlawful appropriation of Plaintiff and the Class members' personal property.

65. Defendants' conduct described herein violates California's Civil Theft statutes, sections 484 and 496 of the California Penal Code.

66. By removing Plaintiff and the Class members' VC, Defendants took and stole their personal property, or fraudulently appropriated property that had been entrusted to Defendants, or knowingly and by false or fraudulent representation or pretense, defrauded Plaintiff and the

Class members of their personal property, in violation of section 484 of the California Penal Code. Defendants' false or fraudulent representation or pretense is continuing, as Defendants have failed to or refused to return the value of the removed VC to Plaintiff or the Class.

67. By taking money from Plaintiff and the Class in exchange for VC in the manner described above with knowledge that any VC remaining in users' accounts would be removed when the game was retired, Defendants receipt of Plaintiff and the Class members' money in exchange for VC constituted theft, or receipt of money known to be obtained through theft, or concealment or withholding of money known to be obtained through theft, in violation of section 496 of the California Penal Code.

68. Defendants' theft deprived Plaintiff and the Class of the value of their VC and Plaintiff and the Class are entitled to recover three times the amount of the full value of the property Defendants wrongfully took, punitive damages pursuant to Civil Code section 3294(c), and costs of the suit and reasonable attorney fees.

### Third Cause of Action

### Unfair Business Practices

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"))

69. Plaintiff incorporates the above allegations as if set forth fully herein.

70. By engaging in the above-described acts and practices, Defendants committed and continue to commit one or more acts of unlawful and unfair conduct within the meaning of the UCL. These acts and practices constitute a continuing and ongoing unlawful business activity, as defined by the UCL, and justify the issuance of an injunction and any other equitable relief pursuant to the UCL.

71. Defendants' acts and practices constitute a continuing and ongoing unlawful business activity defined by the UCL. Defendants interfered with Plaintiff and the Class members' right to possess property, and unlawfully removed valuable VC belonging to Plaintiff and the Class in a manner that constitutes theft. Defendants also failed and continue to fail to fully reimburse losses due to terminations of VC, all in violation of, *inter alia*, the following California laws:

72. California Penal Code section 484(a);

73. California Penal Code section 496; and

74. California Constitution, article I, section 1.

75. Defendants' acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Defendants' conduct is contrary to the public welfare as it transgresses statutes of the State of California designed to protect individuals' constitutional and statutory right to possession of property, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Defendants by creating personal disadvantage and hardship to their customers. As such, Defendants' business practices and acts have been immoral, unethical, oppressive, and unscrupulous and have caused injury to customers far greater than any alleged countervailing benefit.

76. As a direct and proximate consequence of the actions as identified above, Plaintiff and the Class suffered and continue to suffer harms and losses including but not limited to economic loss, the loss of property, harm to their constitutional right to possess property, and emotional distress, anxiety, worry, and shock caused by the taking of their VC.

77. As a consequence of Defendants' unlawful and unfair business practices, Plaintiff and the Class were deprived of the value of their VC and are entitled to restitution for their loss. Plaintiff further seek an order of this Court awarding injunctive relief and any other relief allowed under the UCL, including interest and attorneys' fees pursuant to, *inter alia*, Code of Civil Procedure section 1021.5, and to such other and further relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and the Class, prays for relief and judgment against Defendants as follows:

A. For an order certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23;

B. For an order appointing Plaintiff and his counsel to represent the Class;

C. For an order enjoining Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from removing VC from accounts;

D.     For actual and compensatory damages according to proof pursuant to code and all other applicable laws and regulations;

E.     For restitution to the extent permitted by applicable law;

F.     For punitive damages pursuant to Civil Code section 3294(c);

G.     For pre-judgment and post-judgment interest;

H.     For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

I.     For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demands a trial by jury on all issues so triable.

Dated this 17th day of November 2023.      ERICKSON KRAMER OSBORNE LLP

*/s/ Kevin M. Osborne*
Julie C. Erickson
Elizabeth A. Kramer
Kevin M. Osborne
Attorneys for Plaintiff